**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Kara Lea Maynard

   v.                               Civil No. 14-cv-512-LM
                                           Opinion No. 2015 DNH 192
Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration


**O R D E R**


Pursuant to 42 U.S.C. § 405(g), Kara Maynard moves to reverse the Acting Commissioner's decision to deny her application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, this matter is remanded to the Acting Commissioner for further proceedings consistent with this order.

### I. Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g). However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the [Acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations

omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material Facts, document no. 15.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Maynard has worked as a restaurant manager, retail manager, and most recently, as a customer service representative.  She was last insured for Social Security disability insurance benefits, or DIB, on December 31, 2010.

Since 2007, Maynard has received the following diagnoses: back pain, chronic low back pain, chronic low back pain of probable myofascial etiology, low back pain with left lower

extremity radiculopathy and weakness, fatigue, paresthesia,[1]
hypothyroidism, hypothyroidism with severe fatigue, autoimmune
hypothyroidism, Hashimoto thyroiditis, Vitamin D deficiency,
atypical migraine with neurological symptoms, acute sinusitis,
empty sella syndrome, and depression.  She has also been
diagnosed with fibromyalgia.  Fibromyalgia is "[a] common
syndrome of chronic widespread soft-tissue pain accompanied by
weakness, fatigue, and sleep disturbances; the cause is
unknown."  Stedman's Medical Dictionary 725 (28th ed. 2006).
Fibromyalgia is usually associated with paresthesia, and
"frequently occurs in conjunction with migraine headaches."  Id.
Maynard's medical treatment has included physical therapy,
chiropractic, orthotics, massage, acupuncture, and a variety of
medications, including narcotic pain medication.

     In November of 2009, Maynard began treating with Dr.
Concetta Oteri-Ahmadpour.[2]  By the time Maynard began seeing Dr.
Oteri, she was already taking two Vicodin every four hours for

---

     [1] Paresthesia is "[a] spontaneous abnormal usually
nonpainful sensation (e.g., burning, pricking); may be due to
lesions of the central or peripheral nervous systems."
Stedman's Medical Dictionary 1425 (28th ed. 2006).

     [2] Some documents in the record refer to Maynard's treating
physician as Dr. Oteri-Ahmadpour; others refer to her as Dr.
Oteri.  Throughout this order, the court refers to her as "Dr.
Oteri."

her low back pain, and was getting no relief.[3]  In February of 2010, Dr. Oteri noted that Maynard had "tried amitriptyline and Cymbalta without any relief whatsoever,"[4] and that she needed "to be on chronic narcotics in order to have enough relief to perform her activities of daily living and take care of her children."  Administrative Transcript (hereinafter "Tr.") 374.

In March of 2010, Maynard filed an application for DIB, alleging an onset date of April 1, 2006.  Her claim was initially denied, but after a hearing before an Administrative Law Judge ("ALJ"), she was awarded benefits.

In brief, ALJ Edward Hoban found that Maynard: (1) suffered from four severe impairments: headaches, obesity, a back disorder, and fibromyalgia; and (2) had the residual functional

---

[3] Vicodin is a "trademark for combination preparations of hydrocodone bitartrate and guaifenesin."  Dorland's Illustrated Medical Dictionary 2055 (32d ed. 2012).  Hydrocodone is a "semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects."  Id. at 878.

[4] Amitriptyline chloride is "[a] chemical compound in the tricyclic antidepressant class that can be used to treat some sleep disorders and neurogenic pain syndromes."  Stedman's, supra note 1, at 63.  Cymbalta is a "trademark for a preparation of duloxetine hydrochloride."  Dorland's, supra note 3, at 457.  Duloxetine hydrochloride is a "serotonin-norepinephrine reuptake inhibitor, used for the treatment of major depressive disorder and the relief of pain in diabetic neuropathy."  Id. at 572.

capacity ("RFC")[5] to perform sedentary work, "except [that] she [was] unable to maintain a schedule on a regular and continuing basis due to her need to rest at will secondary to pain and fatigue."  Tr. 89.  Based upon the RFC he ascribed to Maynard and the testimony of a vocational expert ("VE"), the ALJ determined that Maynard was disabled because her physical impairments precluded her from performing any jobs that were available in the national economy.

In reaching his decision, the ALJ relied upon an opinion from Dr. Oteri.  As the ALJ said in his decision:

> Dr. Oteri-Ahmadpour opines that the claimant is not capable of working due to the very limited range of motion of her back and [her] need of chronic narcotics for pain.  While the issue of "disability" under the [Social Security] Act is reserved to the Commissioner, I find Dr. Oteri-Ahmadpour's opinion to be evidence of her assessment of the severity of the claimant's symptoms and resultant functional limitations (Social Security Ruling 96-5p).  Accordingly, her opinion is given weight.

Tr. 89 (citation to the record omitted).  On the other hand, the ALJ discounted an opinion from a nonexamining medical source: "The State agency medical consultant's physical assessment is given little weight because evidence received at the hearing

---

[5] As used in the ALJ's decision, "residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).

level shows that the claimant is more limited than determined by the State agency consultant." Tr. 90.

In the opinion the ALJ discounted, which was prepared in August of 2010, Dr. Hugh Fairly opined, among other things, that Maynard could stand and/or walk (with normal breaks) for about six hours in an eight-hour workday and could also sit (with normal breaks) for about six hours in an eight-hour workday. In the section of the RFC assessment form devoted to Maynard's abilities to sit, stand, and walk, where he was asked to "[e]xplain how and why the evidence support[ed] [his] conclusions" and to "[c]ite the specific facts upon which [his] conclusions [were] based," Dr. Fairley did not write anything. Tr. 476.

After ALJ Hoban issued a decision favorable to Maynard, the Social Security Appeals Council decided on its own to review that decision, vacated it, and remanded for further proceedings. In its remand order, the Appeals Council took issue with ALJ Hoban's findings on Maynard's severe impairments, noting in particular: "There is no diagnosis or evidence from a treating, examining, or non-examining acceptable medical source to support the decision's finding of fibromyalgia." Tr. 93. Then, the Appeals Council directed the ALJ to do four different things, including these three: (1) obtain "a physical consultative

examination with a functional capacity assessment . . . and
available medical source statements about what the claimant can
still do despite [her] impairments," Tr. 95; (2) "obtain [if
necessary] evidence from a medical expert to clarify the nature
and severity of the claimant's impairment," id.; and (3)
"[f]urther consider the claimant's ability to perform [her] past
relevant work," id.

On remand, the Social Security Administration ("SSA")
obtained a consultative examination from Dr. William Windler.
Based upon his examination in December of 2012, Dr. Windler
reached the following conclusions:

> Ms. Maynard is a 33-year-old female who has a history
> of migraine headaches occurring most days and causing
> her generally to retreat to bed.  She has Hashimoto's
> thyroiditis and in her chart there are entries
> indicating elevated thyroid paroxetine antibody
> levels.  She takes thyroid supplementation.  She has
> very minimal thoracolumbar scoliosis.  She had diffuse
> aches and pains and tender points in all four
> quadrants consistent with a fibromyalgia.  She has a
> history of some depression.

Tr. 676.  Dr. Windler also completed a Medical Source Statement
of Ability to do Work-Related Activities (Physical).  In it, he
opined that Maynard could sit for about 30 minutes at a time and
stand or walk for about 15 minutes at a time.  He also opined
that she could sit, stand, and walk for a total of one hour each
during the course of an eight-hour workday, and indicated that

she would need to spend the remainder of an eight-hour work day reclining, lying down, or soaking in a warm tub.

In the space where he was asked to indicate the medical or clinical findings supporting his opinions about Maynard's ability to sit, stand, and walk, Dr. Windler wrote nothing. However, in response to similar questions asked throughout the form with regard to other physical abilities, Dr. Windler gave the following responses:

- history mostly, physical exam findings of diffuse tender points (lifting and carrying)

- history mostly, diffuse tender points (use of hands)

- history, diffuse tender points, tender knees with patellar manipulation, low back pain with hip R.O.M. (use of feet)

- history, physical exam, tender patella, ↓ L.S. spine R.O.M./tenderness, ↓ squatting via exam (postural limitations)

- history, exam findings of diffuse tender points, ↓ L.S. spine flexion & tenderness to palpation diffusely (environmental limitations)

- history, and exam findings as noted on this form & in report for social security (activities)

Tr. 679, 681, 682, 683, 684.  Finally, when asked to indicate when the limitations he found were first present, <u>if he could do so with a reasonable degree of medical probability</u>, Dr. Windler responded: "Likely 2006 onward."  Tr. 684 (emphasis added).

In June of 2013, Maynard's treating physician drafted a letter to whom it may concern, in which she noted the following diagnoses: "Lyme Arthritis, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome, Hashimoto's Disease/Chronic Lymphocytic Thyroiditis, Fibromyalgia, Chronic back pain and Chronic migraines."  Tr. 794.  After describing in detail the clinical bases for those diagnoses, including a finding that Maynard exhibited 16 of the 18 tender points used to diagnose fibromyalgia, Dr. Oteri concluded her letter this way:

> Based upon my findings and her conditions, my medical
> opinion is that Kara Maynard was completely and
> permanently disabled prior to my enrolling her as a
> patient in 2009, became unable to work due to her
> medical issues prior to my enrolling her as a patient
> in 2009, is unable to work in any capacity and that
> her physical conditions are also creating mental
> difficulties that further her disability.  She had
> exhibited these symptoms far before she began seeing
> me, but none of her previous providers ever compiled
> the symptoms to come to a total diagnosis and instead
> treated her on a symptomatic basis.  We have done
> extensive testing on her over the years and we have
> determined that her diseases and their effects
> prohibit her from even performing daily life
> activities and she needs to be on constant narcotic
> medications that do not allow her to work, even on a
> part time basis.

Tr. 797-98.

On remand, Maynard received a second hearing before a different ALJ, Thomas Merrill.  At the hearing, ALJ Merrill took testimony from a medical expert, Dr. Arthur Brovender.  Dr.

Brovender described the medical records on which he based his opinions this way:

> In 1F, your honor, 5/5/09 they talk about Vivarins; in 2F just chronic low back pain; on 7/12/'07 she [weighed] 173 pounds; her MRI of 7/17/'07[]was essentially normal; 3F an MRI from 20/3/'09 of the lumbrosacro spine is essentially normal; in [INAUDIBLE] F they talk about hypothyroidism; in 15F on 12/26/12 she's 5'6", she's 220 pounds; she has whole body pain; she has low back pain.  Examination essentially normal.  And they made a diagnosis of fibromyalgia.  They didn't talk about in this examination of [INAUDIBLE] or tender points.  They didn't say there was – how many points were tender or anything like that.

Tr. 70-71.  Next, the ALJ asked: "[W]hich of these conditions would you opine are medically determined."  Tr. 71.  Dr. Brovender responded:

> A Her examinations are essentially normal, your honor.
> She's overweight, she's obese.  And there's no blood work if she's got an autoimmune disease.  Her MRIs are essentially normal, her physical examination at 2F, normal.

Id.  Then Dr. Brovender engaged in the following exchange with the ALJ:

> Q Are you familiar with the listings [of physical impairments] used by the [C]ommissioner [of Social Security]?
>
> A Yes.
>
> Q Do you have an opinion as to whether she would meet any listing?
>
> A I looked at 1.04A, your honor, for low back pain, and she doesn't meet or equal that.

Q Based upon your review of this record and your experience, education, and training, do you have an opinion as to whether there are any limitations that the claimant would have?

A Your honor, I'm going to factor in – I can't say how much pain she has, I don't know.  Like I can't quantify it and I'll put in her weight.  I'd say she could sit for six to eight hours with normal breaks, stand and walk; two hours of walking, two hours of standing; she could lift ten pounds frequently, 20 occasionally; she can bend, stoop, squat or kneel occasionally.  I wouldn't have her crawl.  She can go up stairs and ramps, ropes, ladders and scaffolds occasionally.  There's no limitation of reaching overhead or fine or gross manipulation.

Tr. 71-72.

In addition to taking testimony from Dr. Brovender, the ALJ also heard from a vocational expert.  The ALJ posed three hypothetical questions to the VE.  In response to the first one, which posited an ability to stand or walk for six hours and an ability to sit for six hours, the VE testified that Maynard could perform her former work as a customer service representative and her former work as a retail manager.  In response to the second hypothetical question, which posited an ability to stand and walk for only two hours each, or a total of four hours, the VE testified that Maynard could work as a customer service representative.  In response to the third question, which posited an ability to walk, stand, and sit for a total of one hour each in an eight-hour workday, the VE testified that there were no jobs that Maynard could perform on

a full-time basis.  Thus, the key issue in this case is

Maynard's capacity for sitting, standing, and walking.

After the hearing, the ALJ issued a decision that includes

the following relevant findings of fact and conclusions of law:

> 3.  Through the date last insured, the claimant had
> the following severe impairments: migraines; and
> chronic low back pain (20 CFR 404.1520(c)).
>
> . . . .
>
> 4.  Through the date last insured, the clamant did not
> have an impairment or combination of impairments that
> met or medically equaled the severity of one of the
> listed impairments in 20 CFR Part 404, Subpart P,
> Appendix 1 (20 CFR 404.1520(d), 404.1525 and
> 404.1526).
>
> . . . .
>
> 5.  After careful consideration of the entire record,
> I find that, through the date last insured, the
> claimant had the residual functional capacity to
> perform light work as defined in 20 CRF 404.1567(b),
> except with the ability to stand and walk for two
> hours each and sit for six hours in an eight hour
> workday, with unlimited use of hands or feet to
> operate controls and to push/pull.  She is unable to
> crawl or climb ladders, ropes and scaffolds, and she
> is able to occasionally balance, stoop, kneel, crouch,
> and claim ramps and stairs.  She must avoid
> unprotected heights.
>
> . . . .
>
> 6.  Through the date last insured, the claimant was
> capable of performing past relevant work as a customer
> service representative.  This work did not require the
> performance of work-related activities precluded by
> the claimant's residual functional capacity (20 CFR
> 404.1565).

Tr. 13, 14, 18.

**III. Discussion**

A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(E).  The only question in this case is whether Maynard was under a disability at any time before December 31, 2010, the last date on which she was insured for DIB.

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step process.  See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the claimant or other witness; and
> (3) the [claimant]'s educational background, age, and
> work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

### B. Maynard's Claims

Maynard claims that the ALJ's decision should be reversed, and her case remanded, because the ALJ erred in assessing her RFC by: (1) improperly weighing the expert-opinion evidence; (2) failing to weigh the "other source" evidence; and (3) improperly assessing her credibility.  Maynard's first argument is both persuasive and dispositive.

In his decision, the ALJ gave "significant weight" to the opinion Dr. Brovender provided at the hearing, "significant weight" to Dr. Fairley's 2010 opinion, "limited weight" to both of Dr. Oteri's opinions, and "limited weight" to Dr. Windler's

opinion.  Maynard objects to the manner in which the ALJ handled the opinions of Drs. Brovender, Oteri, and Windler, while the Acting Commissioner contends that the ALJ gave proper consideration to all four opinions.  The court begins by outlining the regulations that govern the assessment of medical opinions and then turns to each of the opinions at issue in this case.

### 1. Evaluation of Medical Expert Opinions

Under the applicable Social Security regulations, the Acting Commissioner, and by extension the ALJ, is directed generally to give the greatest weight to medical opinions from treating sources, less weight to opinions from sources who have only examined the claimant, and the least weight to medical source who have neither treated nor examined the claimant.  See 20 C.F.R. § 404.1527(c).  That said, however, "the regulations also presuppose that nontreating, nonexamining sources may override treating doctor opinions, provided there is support for the result in the record."  Shaw v. Sec'y of Health & Human Servs., 25 F.3d 1037 (unreported per curiam table decision) (citations omitted), 1994 WL 251000, at *4 (1st Cir. 1994); see also Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (collecting cases in which opinions of treating physicians have been properly discounted).

16

When determining the amount of weight to give a medical opinion from a treating source, the ALJ is directed to consider the length of the treatment relationship and the frequency of examination, along with the nature and extent of the treatment relationship.  See 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii).  When assessing any medical opinion, the ALJ should consider supportability through medical signs and laboratory findings, consistency with the record as a whole, the medical source's specialization, and other factors, such as the source's understanding of Social Security disability programs and his or her familiarity with information in the claimant's case file. See 20 C.F.R. §§ 404.1527(c)(3)-(6).

### 2. Dr. Oteri

The ALJ gave Dr. Oteri's opinions "limited weight because [they were] inconsistent with the claimant's diagnostic and clinical exams," Tr. 17, because "the records show that Dr. Oteri-Ahmadpour [was] a 'personal friend' of the claimant," Tr. 18, and because "her opinion regarding the claimant's inability to perform daily activities is not supported by the claimant's own reported daily activities," id.  The ALJ's appraisal of Dr. Oteri's opinion is not well supported.

In support of his determination that Dr. Oteri's opinion was inconsistent with her diagnostic and clinical examinations,

i.e., that her opinion was not supported, the ALJ wrote: "She [Dr. Oteri] also opines that despite normal test results, the claimant has a diagnosis of fibromyalgia." Tr. 17. There is a two-fold problem with the ALJ's determination.

First, it would appear to be based upon a misreading of Dr. Oteri's opinion, which states:

> The diagnosis of Fibromyalgia is based on the following clinical findings: We did screening laboratory tests to exclude other medical conditions such as rheumatoid arthritis, myositis, hypothyroidism, multiple sclerosis, and lupus. Also, the American College of Rheumatology (Wolfe, et al. Arthritis & Rheumatism 33:160, 1990) has established general classification guidelines for Fibromyalgia. These guidelines require that widespread aching be present for at least 3 months and a minimum of 11 out of 18 tender points be met and the patient meets both of these criteria including at least 16 of the 18 tender points on each examination.

Tr. 795. Based upon the foregoing, Dr. Oteri did not, as the ALJ suggests, diagnose fibromyalgia without a clinical basis for doing so. Moreover, the "normal test results" the ALJ identified are consistent with a diagnosis of fibromyalgia, and the clinical findings on which Dr. Oteri relied are appropriate to support a diagnosis of fibromyalgia. As the court of appeals for this circuit has pointed out:

> Fibromyalgia is defined as "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause." Stedman's Medical Dictionary, at 671 (27th ed. 2000). Further, "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." Harrison's

Principles of Internal Medicine, at 2056 (16th ed.
2005).  The American College of Rheumatology
nonetheless has established diagnostic criteria that
include "pain on both sides of the body, both above
and below the waist, [and] point tenderness in at
least 11 of 18 specified sites."  Stedman's Medical
Dictionary, supra.

Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2010).  Given a

proper reading of Dr. Oteri's opinion, and in light of Johnson,

the court cannot agree that Dr. Oteri's diagnosis of

fibromyalgia was not supported by clinical findings.

The ALJ also discounted Dr. Oteri's opinion because Dr.

Oteri is a "'personal friend' of the claimant."  Tr. 18.

Presuming that is an appropriate ground for discounting a

medical opinion, the evidence upon which the ALJ relied for

making that finding consists in its entirety of a telephone

message sheet filled out by several different individuals who

are identified only by their initials.  The only plausible

interpretation of that sheet, when read in its entirety, is that

Maynard had a medical issue to discuss that was sufficiently

personal that she did not want to mention it to anyone other

than Dr. Oteri.  What is missing here is anything directly from

either Dr. Oteri or Maynard that would indicate that they were

personal friends or that could reasonably support such an

inference.  A single message sheet, completed by intermediaries

standing between Maynard and Dr. Oteri, is not evidence a

19

reasonable mind could accept as adequate to support the conclusion that Dr. Oteri and Maynard were personal friends and that their friendship inspired Dr. Oteri to issue opinions that were more favorable to Maynard's claim than the opinions she would have written for a patient with similar medical conditions who was not a personal friend.

Moreover, while the ALJ focused upon a purported personal relationship between Maynard and Dr. Oteri, he said nothing about the length of the treatment relationship and the frequency of examination, which is a factor he was obligated to consider. See 20 C.F.R. § 404.1527(c)(2)(i). With respect to the nature and extent of the treatment relationship, see id. § 404.1527(c)(2)(ii), the ALJ observed that Dr. Oteri's "records actually show very limited treatment during the relevant time period." Tr. 18. But, by the time Maynard began treating with Dr. Oteri, several forms of treatment for pain, including physical therapy, chiropractic, orthotics, massage, and acupuncture had proven to be ineffective, and Maynard was already on narcotic pain medication, which Dr. Oteri continued. Moreover, in the 2010 opinion from Dr. Oteri on which ALJ Hoban relied when he determined that Maynard was disabled, Dr. Oteri stated that Maynard had "debilitating low back pain for which we have not found an effective treatment." Tr. 567. Given that

Maynard had tried multiple forms of treatment, without success, before she began seeing Dr. Oteri, Dr. Oteri's relatively limited treatment regimen is not substantial evidence supporting a decision to give little weight to her opinion.

Finally, the ALJ stated that Dr. Oteri's opinion on Maynard's inability to perform daily activities "is not supported by the claimant's own reported daily activities, which include caring [for] her three young children, helping with meals and going shopping." Tr. 18. The Acting Commissioner concedes that the record does not support the ALJ's finding that Maynard reported that she went shopping.

In the Function Report on which the ALJ relied for his finding that Maynard helps with meals, Maynard described her food preparation activities this way: "my husband helps me with meals by prepping before he goes to bed our breakfast + lunch," Tr. 237. She elaborated: "I warm things in microwave if needed and my husband preps everything . . . I feed my kids + self daily from prepped meals with help about an hour for all 3 meals . . . I can no longer stand to cut, clean, chop, cook meals." Tr. 238. In that same report, Maynard described her child-care activities this way: "bathe with the children, feed breakfast to kids and myself, get tired; put on movie for kids, rest on couch, eat lunch, take more medication, sit and play a game with

kids if not too tired, nap with kids." Tr. 236.  In addition,
after indicating that she went outside daily, Maynard explained:
"We sit on the stairs to get fresh air but we don't have a
fenced yard so the kids can't play as I can't chase them."  Tr.
239.  In sum, the Function Report on which the ALJ relied to
discredit Dr. Oteri's opinion does not contain substantial
evidence of meal-preparation or child-care activities that is
indicative of a capacity for full-time work.

The bottom line is this.  The ALJ's explanation for giving
Dr. Oteri's opinion limited weight is not supported by
substantial evidence.

### 3. Dr. Windler

The ALJ gave "limited weight to the opinion of the
consultative examiner, Dr. William Windler, M.D. . . . because
it [was] mostly conclusory, with little evidence cited to
support his opinion of disability," because "[t]he functional
limitations appear to be based solely on the claimant's self-
reported limits," and because the "opinion . . . is inconsistent
with [Dr. Windler's] own exam."  Tr. 18.  The ALJ's appraisal of
Dr. Windler's opinion is not well supported.

As noted, the ALJ criticized Dr. Windler's opinion for
being conclusory and citing little evidence.  The Acting
Commissioner goes a step further, pointing out that "Dr. Windler

left blank the section of the form asking him to identify the particular medical or clinical findings supporting his opinion of Plaintiff's extreme sitting, standing, and walking limitations." Resp't's Mem. of Law (doc. no. 14-1) 13-14. However, the opinion from Dr. Fairley, to which the ALJ gave great weight, suffers from the exact same deficiency; Dr. Fairley did not answer the same question that Dr. Windler did not answer. See Tr. 476.

Moreover, when viewed as a whole, Dr. Windler's Medical Source Statement makes it evident that he based his opinion on a combination of subjective history from Maynard and the results of his physical examination, including his identification of "diffuse aches and pains and tender points in all four quadrants consistent with a fibromyalgia." Tr. 676. Specifically, Dr. Windler mentioned his examination and findings in no fewer than six other responses. In addition, the question that Dr. Windler left blank was not just left blank; it was crossed out with an "X" that was intended to eliminate a question right above it that was not applicable. It is clear, when viewing the form as a whole, that Dr. Windler crossed out the question he did not answer by accident, and that his response to that question, had he answered it, would have been similar to the responses he gave to six other similar questions.

In short, the court cannot agree that Dr. Windler's opinion was inadequately supported.  Similarly, because Dr. Windler conducted a physical examination, and referred to its results in both his narrative report and his Medical Source Statement, the court concludes that the ALJ's characterization of Dr. Windler's limitations as being based solely upon Maynard's self-reporting is not supported by substantial evidence.  And, in addition, "'a patient's report of complaints, or history, is an essential diagnostic' tool in fibromyalgia cases, and a treating physician's reliance on such complaints 'hardly undermines his opinion as to [the patient's] functional limitations.'" Johnson, 597 F.3d at 412 (quoting Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)).

Also unfounded is the ALJ's assertion that Dr. Windler's opinion "is inconsistent with his own exam, which shows intact normal function, no deformity of the spine noted, although with some tenderness, normal heel and toe walking, normal reflexes, and normal motion, motor function, and sensation in her lower extremities."  Tr. 18.  For one thing, the "some tenderness" to which the ALJ refers is actually diffuse tenderness in Maynard's neck, in her abdomen (even to light touch), throughout her upper extremities, throughout her thoracolumbar spine, and throughout her lower extremities.  See Tr. 676.  Moreover, Dr. Windler

characterized that diffuse tenderness as "consistent with fibromyalgia," id., a characterization that is consistent with the diagnostic criteria for fibromyalgia, his own findings of diffuse tender points in all four quadrants, and Dr. Oteri's finding that Maynard exhibited 16 of the 18 fibromyalgia tender points.  Beyond that, the ALJ does not explain how the various normal findings he mentions translate into a capacity for sitting, standing, and walking that is any different from the RFC Dr. Windler ascribed to Maynard.

As with the ALJ's appraisal of Dr. Oteri's opinion, the court concludes that the ALJ's assessment of Dr. Windler's opinion is not supported by substantial evidence.

### 4. Dr. Fairley

The ALJ gave Dr. Fairley's opinion "significant weight in light of his medical expertise and knowledge of Social Security Regulations" and "because it [was] generally consistent with the claimant's medical records and reported daily activities."  Tr. 17.  While the ALJ said that Dr. Fairley's opinion was generally consistent with Maynard's medical records, he did not indicate which records, specifically, he was referring to.  Moreover, because Dr. Fairley rendered his opinion in 2010, he necessarily did not have the benefit of the medical evidence on which Drs. Oteri and Windler based their diagnoses and opinions, medical

evidence that is decidedly inconsistent with Dr. Fairley's opinion.

### 5. Dr. Brovender

The ALJ gave Dr. Brovender's opinion "significant weight in light of his medical expertise and knowledge of Social Security Regulations" and "because it [was] generally consistent with the evidence of record, which does not show disabling functional limitations due to pain." Tr. 17. Both Dr. Brovender's opinion and the ALJ's reliance upon it are problematic for several reasons.

First, Dr. Brovender's opinion did not factor in either Dr. Oteri's opinion or the clinical findings and diagnosis on which that opinion was based. See 20 C.F.R. § 404.1527(c)(3) ("because nonexamining sources have no examining or treating relationship with [a claimant], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions," which includes consideration of "opinions of treating and other examining sources"). Then, while he purported to offer an opinion on whether Maynard's low back pain met or equaled the listing for disorders of the spine, Dr. Brovender also stated that he did not know, and could not factor in, her pain.

Finally, Dr. Brovender misconstrued Dr. Windler's opinion. According to Dr. Brovender, Dr. Windler diagnosed fibromyalgia without talking about tender points.  Dr. Windler did not quantify Maynard's tender points, which is one of the diagnostic criteria for fibromyalgia.  See Johnson, 597 F.3d at 410.  But, he did state that his examination identified tender points in five different parts of Maynard's body, spanning all four quadrants, which is the other diagnostic criterion for fibromyalgia.  In addition, other than making passing references to an "essentially normal" physical examination and two "essentially normal" MRIs, Dr. Brovender did not link his opinion that Maynard could sit for six to eight hours, walk for two hours, and stand for two hours to any particular medical signs or laboratory findings.  See 20 C.F.R. § 404.1527(c)(3).  And, as the court has noted, normal physical examinations and diagnostic imaging are not inconsistent with a diagnosis of fibromyalgia and the functional limitations that can result from that medical condition.

Because Dr. Brovender misconstrued Dr. Windler's opinion, and because Dr. Brovender did not support his opinion with citations to medical evidence, see 20 C.F.R. § 404.1527(c)(3), the ALJ's reliance upon Dr. Brovender's opinions is misplaced.

27

## 6. Medical Opinion Summary

The ALJ's handling of the medical opinions in this case warrants a remand.  The Appeals Council directed the ALJ on remand to obtain a consultative examination with an RFC assessment.  The ALJ did so, and Dr. Windler assessed Maynard as having, prior to the expiration of her DIB coverage, physical limitations that, according to the VE, precluded her from working.  The Appeals Council directed the ALJ to obtain available medical source statements about Maynard's capacity for performing work-related activities.  The ALJ did so, and Dr. Oteri gave a statement that was consistent with Dr. Windler's assessment.  The ALJ, however, rejected that evidence in favor of the opinions of two nonexamining medical experts, including Dr. Brovender, who: (1) did not review Dr. Oteri's opinion and the clinical findings reported therein; (2) mischaracterized Dr. Windler's opinion; and (3) did not adequately identify support for his own opinion in the medical evidence.  Because the ALJ's appraisal of the medical opinions is not supported by substantial evidence, this case must be remanded.

## 7. Other Issues

In her memorandum of law, Maynard points out that the ALJ did not apply the relevant SSA guidelines for evaluating DIB claims based upon fibromyalgia.  The Acting Commissioner

concedes that the ALJ applied the wrong set of guidelines.  On remand, the ALJ should apply Social Security Ruling 12-2p, "Evaluation of Fibromyalgia," when considering Maynard's claim.

### IV. Conclusion

For the reasons given, the Acting Commissioner's motion for an order affirming her decision, document no. 14, is denied, and Maynard's motion to reverse that decision, document no. 12, is granted to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

October 7, 2015

cc:  Janine Gawryl, Esq.
     Robert J. Rabuck, Esq.